## WHITE v. GOODRICH-LENHART MFG. CO.

(District Court, E. D. Pennsylvania. April 4, 1921.)

### No. 1883.

Patents ⬗328—1,176,413, for electric terminal, held valid, but not infringed.
   Patent No. 1,176,413 for an improvement in terminals for electric wires, *held* valid when restricted to a construction having a preformed notch or recess, which served the double purpose of effecting a tight connection and permitting more compact construction, but, as so restricted, *held* not infringed by defendant's device, in which the recess was formed only by tightening the nut on plastic metal.

In Equity. Suit for infringement of a patent by Jessee Mercer White against the Goodrich-Lenhart Manufacturing Company. Sur trial hearing on bill, answer, and proofs. Bill dismissed.

Samuel Owen Edmonds, of New York City, for plaintiff.

Synnestvedt, Bradley, Lechner & Fowkes, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This cause concerns itself with letters patent No. 1,176,413, issued March 21, 1916, for improvement in terminals for electric wires. The formal issues are validity (more particularly affecting the scope of the claims) and infringement. Two fact features of the background of the controversy throw some light on what has caused it, if not its merits. One is the large number of Ford cars in use, and the consequent value of the control of the trade in re-equipment accessories needed by Ford car users; the other, the fact that a former associate or employee of the plaintiff, who thereby came to learn of the business which could be done in devices, such as those in litigation, is now associated with defendant. This gives to the case something of the atmosphere of unfair competition.

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The case is easily disposed of by going part way with each litigant. Validity may be found by limiting the claims to a terminal having what may be called a preformed gripping feature. Defendant does not strenuously oppose this, because it carries with it a finding of noninfringement. The real question is whether plaintiff's rights extend beyond this. Counsel for plaintiff insists with earnestness that the patent covers a notch formed by the act of the attachment of the wire to the post, and supports this position by a clear-cut and forcible argument.

It is natural for any one who creates a market to lay claim to it. There is the same sense of rightful proprietorship there is to a patentable invention. The maker of a car in large demand thinks he should have the exclusive right to the trade in accessories and supplies of which the car users are in need. Those who supply the trade by an arrangement with the maker feel that they have succeeded to his rights. Any one from the outside who seeks this trade is regarded as an intruder.

The plaintiff's device is well adapted to the needs of Ford car owners. It has been accepted (with some modifications) by the manufacturer, and has been made a part of the equipment of a Ford car. When replacement is required, this is the trade which the plaintiff looks upon as his own. This contractual relation with the car manufacturer has some bearing upon the commercial success features of the case. When plaintiff's device was thus accepted and largely used on the Ford car, the number becomes impressive from this alone. It would thus have a large sale, whether it had merit or not. The user is likely to replace a terminal with its like. The trade in them is thus also at once large.

Utility is thus argued, but there is little need of it, where infringement exists, as no infringer can very well deny merit to what he has imitated. The real question is one of invention, or rather wherein invention consists. The original application claimed for the terminal a form of construction which economized space and that it was thereby "securely gripped to the conductor or wire."

This language and the further reference to efficiency is to be interpreted in the light of the fact that the requirements of a good terminal are that it shall not, either in its passage through the factory or after being put in use, become detached from the wire, and that when in use there should be a secured connection, both physically and electrically, with the post to which it is attached, and of the further fact that this security of connection was in the prior art attained by soldering. In the patented terminal this security is afforded by a notch being forcibly formed of a portion of the metal plate used, which pressed into the insulating covering of the wire, thus giving the terminal a strong holding attachment to the wire. Inasmuch as there is no mention of solder, which is admitted to give a good holding attachment, as well as electrical connection of terminal with the wire, and as economy cost is also claimed, this must mean that the improvement was in dispensing with solder.

There is a further merit claimed for this notch that it permitted the use of a nut in small space. Just what was meant by this is not clear,

271 F.—22

unless it meant that in forming the notch a depression in circular outline extending toward the wire was produced in the plate and of a size to accommodate a nut.

Three claims were made for this invention: (1) Of a terminal possessing this notch or recess formed in the part of the plate between the hole which received the post and the part which enclosed the wire; (2) of the combination of such a terminal with an insulated electric wire; and (3) another combination having the added element of the naked end of the conductor wire "projected through a slit in the plate."

These claims were all rejected by the Patent Office; the Fitzgerald, Ball, and Briggs patents being cited as references. Claims 1 and 2 were flatly rejected as included in the Ball invention, and claim 3 as a mere assemblage of expedients of the prior art producing no new function. Just what meaning was given to the claims thus rejected is not stated. An amendment, however, was allowed, which withdrew the three claims made, and substituted the two on which the patent issued. These new claims are interpreted by ascribing invention to the advance upon the prior art, in that this curved depression in the upper plate performs the double function of giving a grip upon the conductor, thus securing it to the terminal, and also affords a seat for the nut. The merit of economy in metal and space is ascribed to this latter feature.

The advantages of a small terminal are clear enough; but as this terminal is made in practice, and in view of the charge of contributory infringement made against the defendant, how the recess reduces the required size of the terminal is not so clear. The comment relates evidently to a preformed recess or depression. This is made sure by the comment which follows. If the plates were of rigid metal, space economy would result from the presence of the recess; but if the metal be so plastic that the ordinary pressure of a nut would form the recess in attaching the terminal to the post, then there would be no need of increased size to accommodate the nut, when there was no preformed recess. The significance of this becomes apparent when we take up the question of infringement.

Defendant's terminal has no notch, recess, or bite, and of course no resulting attachment of terminal with wire. The attachment is due to solder. There is further no economy of space or metal produced by the presence of any preformed seat for a nut. It follows that there is no direct infringement. If, however, the notch of the patent is not a preformed notch when the nut comes to be applied, the effect is, as the metal is plastic, that the nut forms the very notch or bite described in the patent. This is the expected result. Again, it follows that, as the defendant made for an expected and intended use that which could only be used by being first made into the terminal of the patent, the defendant would be guilty of contributory infringement.

Some question is raised of the fact of the notch being made by the pressure of the nut in fastening the terminal. Whether it is so formed or not depends, of course, upon the pressure applied and the plasticity of the metal of which the ears of the terminal are made. We make the fact finding that it is so formed in practice, and that the terminal is

made as it is made with the knowledge on the part of the defendant of its intended use, and that this use will result in the formation of the notch.

We refuse to find, however, that the defendant intended this result in the sense of having the notch function operate. We so find, because it had no motive for so intending, as it was indifferent whether the notch was formed or not. We say this in view of both branches of the double function which the Patent Office found. The attachment feature was of no value, because solder answered to this purpose. The recess feature was of no patentable value of itself, because there would be no invention in doing what could not be avoided. A man might, in the discover or observe sense of the word "invention," learn that such a notch was formed, and appreciate its functioning value; but this would not be invention in its patentable sense. In its etymological sense invention means a coming upon or finding; but, as used in the patent laws, it carries the sense of a creation, or, at least, of an original discovery, in the sense of something not before observed by any one. If, for illustration, terminals, such as these, had been in use, and these notches had been formed by their use, and the defendant had been the first to appreciate that the notch performed the function of either tying the wire to the terminal or making a terminal of less size available or both, he would have made a discovery but he would have invented nothing. If he had thought of using (what had not before been used) a metal so plastic as to form the notch then he might lay claim to an invention.

To justify claim to a monopoly the plaintiff must make two showings: He must have invented something, and he must have received a patent for his invention. The letters, it is true, are evidence of both, but give him no greater right than they grant, even if he had invented more, and was entitled under the law to a patent for more. The file wrapper makes it clear that the grant was only of a terminal with a preformed notch. The denial of the first claim means this, without the explanatory memorandum. The history of the art discloses the why of the ruling made by the Patent Office. Terminals of this general kind were old. The use of solder was, however, necessary, and they must be of a size to admit of the use of a nut. If solder was not used, the terminal would become detached in passing through the processes of manufacture, or even in transportation, as well as when put in use. By preforming the notch there was no need of solder. It also provided a seat for the nut, thus doing away with the need of forming a seat in the act of use or of larger plates.

A terminal with a preformed notch was in consequence patentable. The invention was not in the functioning, but in the construction which exhibited these functions. If the notch was not preformed, it had no function until formed by the nut. All functioning value before this was absent, and, as the notch could not be avoided being formed, there was no invention in forming it, as there was no new element of construction provided in order to form it. Invention is therefore confined to the preformed notch. The consequence, as before stated, is that the defendant's terminal does not infringe, as it has no such preformed notch. It may

be further stated, for whatever it may be worth, that the motive of the patented invention was to dispense with the solder. Not only does the defendant use it, but the chief user of plaintiff's terminal also uses solder. The practical consequence has been that numbers of plaintiff's terminals are put out without notches being preformed in them.

The bill of complaint may be dismissed, with costs, on the finding of noninfringement. A formal decree to this effect may be submitted. No decree is now made.